HERBERT W. RHODES *vs.* ISADORE GREEN & others.

Suffolk.　May 23, 1928.— June 29, 1928.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & SANDERSON, JJ.

*Contract,* What constitutes, Performance and breach.　*Architect.*

At the trial of an action to recover for breach of an oral agreement by the defendant to employ the plaintiff as an architect, there was evidence that the plaintiff interested the defendant in certain property owned by a third person, with whom the defendant negotiated for a purchase; that the defendant asked the plaintiff to look after his interests and promised the plaintiff that, in return for such services, he should have the architectural work in connection with a building to be erected if the defendant should buy the property; that the plaintiff requested compensation on the basis of a certain percentage, which the defendant stated was satisfactory, although he did not wish any plans drawn by the plaintiff until title passed; that the plaintiff thereupon looked after

the defendant's interests as requested; and that the defendant subsequently took title to the property, upon which he erected a building, after having notified the plaintiff that he would not employ him as architect therefor. The trial judge denied a motion by the defendant that a verdict be ordered in his favor. *Held,* that

(1) The jury properly could find that a complete and enforceable contract was made between the parties, which the defendant broke without justifiable cause;

(2) The motion properly was denied.

CONTRACT. Writ dated July 22, 1925.

In the Superior Court, the action was tried before *Williams,* J. Material evidence is stated in the opinion. There also was evidence that the defendants did build a building which cost about $60,000. At the close of the evidence the trial judge denied a motion by the defendants that a verdict be ordered in their favor, to which denial the defendants alleged an exception. There was a verdict for the plaintiff in the sum of $2,004.90.

The case was submitted on briefs.

*B. Spinoza,* for the defendants.

*L. R. Chamberlin & R. J. Cook,* for the plaintiff.

PIERCE, J. This is an action to recover damages for a breach of an alleged oral contract to employ the plaintiff as an architect of a building which the defendants contemplated erecting, and which they subsequently did erect in Sanford, Maine. The answer was a general denial. At the close of the evidence the defendants filed a motion for a directed verdict. This motion was denied, the case was submitted to the jury, and a verdict was found for the plaintiff. No exceptions are shown by the record to have been taken during the course of the trial to the admission or rejection of testimony or to the charge. It therefore is assumed that the jury were fully and accurately instructed as to the law relating to the formation of contracts and as to the obligations of the parties thereto. The defendants in their brief admit that "The defendant Isadore Green represented all of the defendants, and no question of his authority is herein raised." The only issue the defendants raise in their bill of exceptions is, Should the motion duly filed by them for a directed verdict have been granted?

The evidence in support of the plaintiff's contention disclosed in the record warranted the jury in finding the following facts: The plaintiff, an architect living in Portland, Maine, in the spring of 1925 brought to the attention of the defendant Isadore Green, a member of the firm of Green Brothers, engaged in the chain store business in New England, with an office in Roxbury, Massachusetts, the possibility of leasing a store in a proposed building or purchasing a lot of land in Sanford, Maine, owned by one Batchelder. The defendants were interested in the project and as a result of an arrangement made by the plaintiff, the defendant Isadore Green and the plaintiff went to Sanford on May 25, and again on June 11, 1925, and there negotiated with Batchelder regarding the leasing of a store in a building to be built by Batchelder, and also in regard to the possible purchase of the lot of land upon which Batchelder had in mind to erect the store building. The result of the conference on May 25, 1925, was that Green went away from Sanford with an oral agreement that he should have a second chance, if Batchelder didn't want to sell or build for "the Woodbury's," who had a first option on the property. On the return journey Green and the plaintiff had a conversation during which Green stated "that he felt that his chance at getting the property was perhaps a little slim, and he said, 'I want you to look after my interests, and I will see that you are well paid for it.'" To this the plaintiff replied, "I am not in the real estate business; I am not a broker of any kind. I am just an architect, and I am only interested in seeing Mr. Batchelder gets tenants for that particular piece of property, so that he will build, and then I will get a job on it." Green then said: "Well, we are interested in buying if Mr. Batchelder doesn't care to go ahead, and we want somebody up here to look after our interests." The plaintiff replied: "Well, I would be glad to do it providing I got the architectural work from you in payment for the services I render," and Green said, "Well, I want you to look after our interests, and I will see that you are well paid." The plaintiff repeated he "was not in the real estate business," and Green replied, "Well, you look after our interests and you will have

the architectural work if we should buy, but at any rate do not let this lease get away from us."

On June 10, 1925, the plaintiff went to Boston and saw Isadore Green at his office. He told him that the first option on the property had been given up, that he was now in line to take the property, and that Batchelder was "talking more that he would prefer to sell, rather than build." After a conference with his partners Green arranged with the plaintiff to go with him to Sanford the following day. On that day, June 11, 1925, Green and Batchelder "made a tentative agreement of sale of the real estate for $60,000." Green knew that this oral contract "couldn't be enforced legally." On the way back to Biddeford, Maine, Green and the plaintiff discussed the matter of the plaintiff's fee, what he would charge, and the way he did his work. "Mr. Green asked . . . [him] what . . . [his] fee was for such work, and . . . [he] told him it was 6%, or that if he didn't want the entire service, which included the plan, supervision, letting of the contracts, and looking after the surveys, and the other work . . . [he] had previously done for him, that he could pay . . . [him] by the hour; that is, . . . [he] would charge him $15 a day for . . . [his] own time, and $1.50 an hour for . . . [his] office help, and he would pay all the expenses connected with it, drawing blueprints, telephone calls, travelling expenses, etc." Green said, "I think the 6% basis would be entirely satisfactory, as that is the usual charge." The plaintiff said it was entirely satisfactory to him. The plaintiff and Green then had "a general discussion on the different types of buildings that might best suit Sanford," and Green said to the plaintiff, "I want you to go to Sanford when . . . [the] survey is made of the property, and look after my interests and see that I don't lose any land, see that these lines are straightened out, and familiarize yourself with the various boundaries and with the agreements, so that when we draw those plans, they will be absolutely correct." The plaintiff replied, "By that I presume you mean that I am employed to look after — do your work?" and Green answered, "You are." In a general way there followed a talk of the price of the building that was to be built, the

plaintiff figuring that a building one story in height to cover this lot would cost about $50,000. He suggested that he make a sketch and submit it to Green, that in that way there would be something definite for Green and his brothers to look at and study while waiting for the title and the actual boundary lines, but Green said "no," he didn't want to spend anything, or obligate himself in any actual expense until these deeds were actually passed "because . . . this is only a verbal agreement, and there are lots of chances for a slip up."

After the interview the plaintiff went to Sanford and did the work Green had employed him to do. He there met the engineer employed by Batchelder, assisted him in laying out lines and trying to get grades on the lot, conferred with an attorney, found some complications, talked on several occasions over the telephone with Green, again talked with the attorney, and finally finished the work in accordance with the conversation Green had had with Batchelder. He went to Boston four or five times before July 9, for the purpose of hurrying up the transfer of title so he could go to work on the plans. "Green didn't care to previously, and kept informing . . . [him] he didn't want to do anything until he got his deed."

On July 9 or 10, 1925, the plaintiff received a letter signed by the defendant which is as follows: "As I promised you to let you know as soon as we passed title in Sanford, Maine, I have just received a letter from our Attorney stating that he has passed title, and no doubt you should receive and are entitled to a commission for the sale of this property. I have taken the matter up with my associates and called their attention as to using you as the architect on this job, as I felt you being so near could look after it advantageously. However, in view of the fact that we have our architect who does all our work, which includes laying out our stores as well as counters, etc., they did not deem it advisable or practicable not to let our regular architect do this job. Thanking you for all the courtesies you have extended to me, and whenever you are in Boston, I will be very glad to have you call on me."

The foregoing statement of facts manifestly presented a case for the consideration of a jury. There could have been found to be a complete understanding between the parties of every essential requisite to the creation of an enforceable contract, and the jury could warrantably have found that the defendants without just cause had violated their agreement. No citations of authority are needed.

*Exceptions overruled.*